# IN THE COURT OF APPEALS OF IOWA

No. 16-2023
Filed April 18, 2018

**ROBERT BUTTS,**
        Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
        Respondent-Appellee.

_____

        Appeal from the Iowa District Court for Pottawattamie County, Mark J. Eveloff, Judge.

        An applicant appeals from the district court ruling dismissing his application for postconviction relief. **AFFIRMED.**

        Marti D. Nerenstone, Council Bluffs, for appellant.

        Thomas J. Miller, Attorney General, and Sheryl Soich, Assistant Attorney General, for appellee State.

        Heard by Vogel, P.J., and Potterfield and Mullins, JJ.

**VOGEL, Presiding Judge.**

Robert Butts was convicted of one count each of first-degree burglary, second-degree kidnapping, going armed with intent, assault while participating in a felony, assault with the intent to commit sexual abuse, carrying weapons, and possession of burglar's tools. He filed a postconviction-relief action, asserting his trial counsel was ineffective. The basis for the action was that counsel disclosed a letter Butts had composed, failed to object to statements made by the prosecution, failed to move for a mistrial, and failed to object to asserted improper judicial conduct. Additionally, Butts claims his appellate counsel was ineffective in failing to seek further review and failing to challenge trial counsel's disclosure of the letter. Finally, Butts asserts his kidnapping conviction should be reconsidered in light of our supreme court's ruling in *State v. Robinson*, 859 N.W.2d 464 (Iowa 2015). Agreeing with the postconviction court's ruling, we affirm.

## I.    Background Facts and Proceedings

The charges Butts faced stemmed from allegations that on November 11, 2009, Butts broke into an apartment, shared by two sisters, armed with a handgun and a knife. He locked the front door behind him, dragged one sister to a back bedroom at gunpoint and attempted to rape her before being interrupted by police officers.

After a jury found Butts guilty, he appealed his convictions raising sufficiency-of-the-evidence claims, evidentiary claims, a search warrant complaint, and a jury instruction challenge. This court affirmed Butts's convictions. *See State v. Butts*, No. 11–0069, 2011 WL 5867065, at *8-20 (Iowa Ct. App. Nov. 23, 2011). On December 19, 2014, Butts filed an application for postconviction relief (PCR),

raising various ineffective-assistance-of-counsel claims.  After a hearing, the PCR court denied Butts's claims.  Butts appeals.

## II.    Standard of Review

"Generally, an appeal from a denial of an application for postconviction relief is reviewed for correction of errors at law."  *Perez v. State*, 816 N.W.2d 354, 356 (Iowa 2012) (citation omitted).  "However, when the applicant asserts claims of a constitutional nature, our review is de novo.  Thus, we review claims of ineffective assistance of counsel de novo."  *Ledezma v. State*, 626 N.W.2d 134, 141 (Iowa 2001).  "[W]e give weight to the lower court's findings concerning witness credibility."  *Id.*

## III.    Kidnapping Reconsideration

Butts claims his kidnapping conviction should be reconsidered because the facts closely mirror those in *Robinson*, 859 N.W.2d at 465–67, in which our supreme court found there was insufficient evidence to uphold the kidnapping charge.  Although the question of whether his acts constituted kidnapping was resolved in Butts's direct appeal, he claims it should be reconsidered because the *Robinson* decision postdated his direct appeal.  We begin with a more detailed explanation of the undisputed facts presented to the jury.

At approximately 11:00p.m. on November 11, 2009, Butts picked the deadbolt lock of the sisters' apartment.  He entered and locked the door behind him.  He found one of the sisters watching television, but he was unaware the second sister was in her own room.  Butts was wearing plastic gloves and a hooded sweatshirt but he was not wearing shoes.  He pointed a gun at the first sister's head and asked whether anyone else was in the apartment.  She loudly told Butts

no one else was at home, hoping her sister would hear her and call the police. Butts then grabbed the back of her arm and pulled her from the couch at gunpoint, dragged her down the hallway, and pushed her into a bedroom. He attempted to close the bedroom door, but something prevented the door from fully closing. He ordered the woman to undress, but she refused. He then forcibly removed her sweater, tank top, and bra before unbuttoning and unzipping her pants.

During this time, the second sister crept into the bathroom and called police. When the police arrived, the second sister opened the front door, and the police entered the bedroom. As Butts turned to face the bedroom door the first sister grabbed him by the back of his sweatshirt and took the gun, which he had placed in his back waistband. A combative and uncooperative Butts was then taken into custody.

By comparing the facts of this case to those in *Robinson,* Butts argues he should not have been convicted of second-degree kidnapping. He asserts *Robinson* changed the framework for analyzing kidnapping cases when it dismissed Robinson's kidnapping charges for insufficient evidence, because the "confinement or removal" of the victim was incidental to the underlying sexual abuse charge and not an independent crime. *See* 859 N.W.2d at 467–83. We disagree.

Referencing its holding in *State v. Rich*, 305 N.W.2d 739, 741–42 (Iowa 1981), our supreme court, in *Robinson*, held sufficient evidence supports a kidnapping conviction when "the defendant's confinement of the victim *substantially* increased the risk of harm, *significantly* lessened the risk of detection, or *significantly* facilitated escape of the perpetrator." 859 N.W.2d at 481 (emphasis

in original). The *Robinson* court noted many of the cases upholding kidnapping convictions feature the use of a weapon such as a gun or knife. *Id.* at 477–78 (citing *State v. Griffin*, 564 N.W.2d 370, 372–73 (Iowa 1997) (beating and sexually assaulting victim with a bottle); *State v. McGrew*, 515 N.W.2d 36, 39–40 (Iowa 1994) (possessing a knife and gun with him during attack); *State v. Hatter*, 414 N.W.2d 333, 338 (Iowa 1987) (forcing victim into defendant's car at knifepoint); *State v. Knupp*, 310 N.W.2d 179, 181 (Iowa 1981) (cutting through victim's clothing with a knife)). The *Robinson* court concluded "this heinous concept underlies the *Rich* tripartite test with its attendant intensifiers." *Id.* at 482. Therefore, *Robinson* merely clarified an existing rule by relying on the three-factor test outlined in *Rich*.

Here, Butts locked the front door and forcibly led the first sister away from the front living area and into a bedroom at gunpoint. On two occasions, Butts threatened to hurt the first sister if she screamed. Once taken into custody, police also located a knife on Butts. Although the act of locking the door and leading the young woman to another room is similar to *Robinson*, this case diverges from *Robinson* due to the presence of two weapons—the knife, and the gun drawn and pointed at the victim while forcing her to a back bedroom—whereas *Robinson* did not feature a weapon. Consistent with the conclusion that the weapons substantially increased the risk of harm, the evidence, under a totality of the circumstances test, therefore supported kidnapping, and Butts is not entitled to reconsideration of that conviction. *See id.* at 479.

### IV. Ineffective Assistance of Counsel

Butts next asserts his trial counsel was ineffective by disclosing a letter Butts had composed, first to his own expert and then to the State. "In order to

succeed on a claim of ineffective assistance of counsel, a defendant must prove: (1) counsel failed to perform an essential duty; and (2) prejudice resulted." *State v. Maxwell*, 743 N.W.2d 185, 195 (Iowa 2008) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "Both elements must be proven by a preponderance of the evidence. However, both elements do not always need to be addressed. If the claim lacks prejudice, it can be decided on that ground alone without deciding whether the attorney performed deficiently." *Ledezma*, 626 N.W.2d at 142 (citations omitted).

### A. Attorney-Client Privilege

Butts claims his trial counsel violated the attorney-client privilege by disclosing a letter to his medical expert and to the State without Butts's consent.[1] The lengthy letter, written by Butts, detailed events and personal struggles in his life leading up to the events of November 11, 2009. Butts's trial counsel turned the letter over to an expert in forensic psychiatry prior to an evaluation in preparation for his diminished capacity defense. Eventually, the letter was disclosed to the State.[2] The State asserts Butts's trial counsel breached no duty because Butts consented to the disclosure to his expert. Further, Butts can show no prejudice because the prosecution would have learned of the evidence after the expert witness evaluated Butts's mental health and testified to the reasons for his diminished capacity, and the State gained similar information on a search of Butts's computer hard drive.

---

[1] The letter was not admitted into evidence at trial.
[2] In a deposition for this matter, Butts's trial counsel did not remember how the trial prosecutor obtained the letter.

Butts asserts no rule requires disclosure of this letter and, even if disclosure is allowed, his trial counsel did not have his consent; however, the record contradicts Butts's assertion. On the first page of the letter Butts wrote, "I don't know if this long (I suspect it will be long) 'essay' will be a good thing to give a psychiatrist or not. Maybe it would be best to let him or her make these discoveries independently. I will let you decide that." (emphasis in original). During Butts's redirect examination at his criminal trial, his trial counsel asked him about his understanding of the purpose and procedure regarding the letter:

> Q. Now reviewing the letter that you wrote to me, 30 pages, I think we've established that it was written December the 12, 2009? A. Which—the one to you?
> Q. The 30—the long one. A. Yes.
> Q. Do you remember when I was first hired in November that there was a concern by your family about your mental health? A. Yeah, I would think so.
> Q. And do you remember that I assured them that I would—I would get you evaluated? A. I don't know what you assured them but you told me that you had told them you were going to explore that, yes.
> Q. All right. And you remember me telling you in December to start writing this now while you remember it— A. Yes.
> Q. —so we could use it and present it to whoever did the evaluation? A. Yes.
> Q. And I've reminded you that this is part of the material that I sent to Dr. Wilson so he could do his evaluation? A. I had forgotten that, but yes.
> Q. All right. Just to clarify that. A. Yes.
> Q. And that as part of the discovery process— A. Absolutely.
> Q. —I provided a copy to the county attorney so he knew all the materials that [the expert] reviewed to come up with his diagnosis? A. I fully understand, yes.

We conclude Butts's trial counsel did not breach an essential duty when he disclosed the letter because Butts gave his attorney the authority to do so.

However, even if we assume that trial counsel breached an essential duty by disclosing the letter, Butts cannot demonstrate he was prejudiced by counsel's

action. The State was already aware of highly sensitive, if not much more damaging, information contained on Butts's computer. In an effort to shore up his diminished capacity defense, Butts's expert testified as to very personal details in Butts's life leading up to these charges. He also testified he knew Butts had accessed various disturbing websites, as noted in the minutes of evidence. Therefore, Butts cannot demonstrate any prejudice resulted from counsel's disclosure of the letter when essentially the same, if not more damaging, information was contained elsewhere in the record. *See State v. Trudo*, 253 N.W.2d 101, 108 (Iowa 1977) (stating "ordinarily, a defendant may not claim prejudice where the same evidence is otherwise supplied by the defendant or is made overwhelmingly clear in the record.").

In addition, given the strength of the evidence against him, Butts cannot show prejudice. Butts pursued intoxication and diminished capacity defenses by claiming he had absolutely no memory of the acts he was accused of committing. On cross-examination, the State questioned Butts as to his intent on the night in question, leading up to and immediately following the criminal activity:

> Q. You also understand that there's a big difference between legally impaired to drive and intoxicated as a legal defense to crimes? A. I do understand the difference, yes.
> Q. Okay. And you would agree that when you left the Razzle Dazzle—actually, let's back that up. When you arrived at the Razzle Dazzle, you intended to have a conversation with someone? A. Correct.
> Q. And you actually had a conversation? A. And I don't remember the details of it, but yes. As far as I know, yeah.
> Q. And you intended to buy a drink? A. Yeah.
> Q. And you did buy a drink? A. Correct.
> Q. And then you intended to leave? A. Sure, yeah.
> Q. And you did leave? A. And I left, yes.
> Q. And then you intended to drive to your apartment? A. Yep.
> Q. And you did drive to your apartment? A. Right.

Q. So we know that at least around the hours of 10:15-ish I believe was your testimony— A. Probably, yes.

Q.—that you're intending things and doing what you intend? A. Oh, yeah. And I've already testified, you know, beyond that point when I remember things and I certainly intended things.

Q. Okay. And then when you came to in the apartment? A. In the apartment?

Q. In the [sisters'] apartment, I'm sorry, thank you. In the girls' apartment when you came to and they're leading you out into the parking lot, I believe I heard you testify that you intended to take the gloves off of your—you noticed you had gloves on your hands? A. I noticed I had something on my hands and it was—my hands were sweating so I took off what I had.

Q. So you intended to take the gloves off of your hands? A. Yes, uh-huh.

Q. And you did take the gloves off of your hands; right? A. Uh-huh.

Q. And that is within minutes of this incident? A. I don't recall but maybe it is. If that's the testimony, sure.

Q. Okay. So you were intending and following through on your intent up to—I mean minutes before—I'm sorry, I need to—I need to go further. You got to your apartment? A. Uh-huh.

Q. You intended to get out of your car? A. Yes.

Q. And you did get out of your car? A. Yes.

Q. You intended to enter your apartment? A. Yes.

Q. And you did enter your apartment? A. Yes.

Q. You intended to pour yourself a scotch? A. Correct.

Q. And you did pour yourself a scotch? A. Yeah.

Q. You intended to drink that scotch? A. And I drank that scotch.

Q. And you drank that scotch; correct? A. Yes.

. . . .

Q. And we know that as I believe [trial counsel] asked you that you are in custody around 11:27? A. Okay, uh-huh.

Q. Do you recall that? A. Yes, I remember that.

Q. Okay. So we know that at about around 11:30 you're getting marched out of the apartment? A. Uh-huh.

Q. Correct? And that's the point where you intend to take off the gloves and you do take off the gloves? A. I took off the gloves at that time, yes.

Additionally, Butts arrived at the apartment carrying a loaded hand gun,

knife, gloves, and lock-picking equipment. He was wearing a hooded sweatshirt

with the hood pulled over his head, obscuring most of his face, and he was not

wearing shoes.  Once he arrived at the apartment, he picked the lock, entered, locked the deadbolt behind him, threatened the first sister at gunpoint, forced her to another room, and disrobed her.  With all of the uncontroverted facts presented, Butts is unable to show that his counsel's disclosure of the letter to the expert or the State prejudiced him so as to undermine confidence in the outcome.  *See Strickland*, 466 U.S. at 694.

Adding another layer to his claim, Butts also alleges his counsel's performance was so deficient as to cause structural error by the negligent handling of the letter.  *See Lado v. State*, 804 N.W.2d 248, 252 (Iowa 2011).  Structural error occurs:

> (1) [when] counsel is completely denied, actually or constructively, at a crucial stage of the proceeding; (2) where counsel does not place the prosecution's case against meaningful adversarial testing; or (3) where surrounding circumstances justify a presumption of ineffectiveness, such as where counsel has an actual conflict of interest in jointly representing multiple defendants.

*Id.*  Butts claims he was denied meaningful representation in this case, asserting his trial counsel was "lax and irresponsible" and his "failures were pervasive."  We disagree.  The trial lasted just over one week, and the record reveals counsel placed the State's case against meaningful adversarial testing.  His counsel secured a noted forensic mental health expert, who provided the basis of a diminished capacity defense by testifying at length as to the possible reasons Butts had no memory of his conduct.  His counsel cross-examined witnesses to the extent Butts did not have any additional questions to ask, and he lodged objections after inappropriate statements from the State.  Ultimately, it was up to the jury to believe all, some, or none of a witness's testimony.  *See State v. Forsyth*, 547

N.W.2d 833, 836 (Iowa Ct. App. 1996). We do not find on this record a lack of representation such that Butts can now claim his trial counsel was so deficient as to cause a structural error in the proceedings.

Finally, Butts asserts his appellate counsel was ineffective because he did not pursue the issue of the trial counsel's disclosure of the letter on appeal, and the appellate counsel failed to file an application for further review with our supreme court. We judge ineffective-assistance-of-appellate-counsel claims against the same two-pronged test used for ineffective-assistance-of-trial-counsel claims. *Ledezma*, 626 N.W.2d at 141. Because Butts was not prejudiced by trial counsel's alleged disclosure of the letter, he cannot show he was prejudiced by appellate counsel's failure to pursue the issue of disclosure of the letter.

Further, Butts claims that his appellate counsel's failure to seek further review prohibited him from seeking federal habeas corpus relief, but he does not assert that his application for further review would ultimately be successful at our supreme court. *See* Iowa R. App. P. 6.1103(1)(b). Federal courts may grant habeas corpus relief only when an applicant demonstrates his state court conviction "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (2012). Upon our review, we conclude Butts has not demonstrated any ground or prejudice that entitles him to relief. Butts does not assert any claim adjudicated on the merits in state court resulted in a decision that was contrary to, or involved an unreasonable application of, federal law. Therefore, Butts has not shown he was prejudiced by appellate counsel.

## B. Prosecutorial Misconduct

Butts next asserts his trial counsel was ineffective when counsel did not object to certain statements made by the prosecution and when counsel failed to move for a mistrial after the district court overruled his objection to one of the prosecutor's statements. Whether trial counsel failed to perform an essential duty is determined by comparing counsel's work "against the standard of a reasonably competent practitioner, with the presumption that the attorney performed his duties in a competent manner." *State v. Stallings*, 658 N.W.2d 106, 109 (Iowa 2003). To prove prejudice resulted, "the defendant must show that, but for counsel's error, there is a reasonable probability that the results of the trial would have been different." *Id.*

In order to determine whether counsel was ineffective in failing to object to prosecutorial misconduct, we must first determine whether prosecutorial misconduct occurred. *State v. Graves*, 668 N.W.2d 860, 869 (Iowa 2003). To do so, the court considers the following factors:

> (1) the severity and pervasiveness of the misconduct; (2) the significance of the misconduct to the central issues in the case; (3) the strength of the State's evidence; (4) the use of cautionary instruction or other curative measures; and (5) the extent to which the defense invited the misconduct.

*Id.*; *see also State v. Schlitter*, 881 N.W.2d 380, 394 (Iowa 2016) (making a distinction between prosecutorial misconduct and prosecutorial error and noting the *Graves* multifactor test for prosecutorial misconduct "easily translate[s] to an evaluation of prosecutorial error."). Prejudice is the deciding factor, not the misconduct itself. *Graves*, 668 N.W.2d at 869.

First, Butts contends the prosecution's reference to John Hinckley was improper. During cross-examination of the medical expert, the prosecution stated:

Q. When did—let me ask you this. Are you familiar—You belong to the American Psychiatry or—I'm sorry, the American Psychiatric Association? A. Yes, I do.

Q. All right. And you're aware, of course, that they have a position statement on the insanity defense? A. Yes.

Q. And that they've had that since 1982? A. I believe so, something like that.

Q. And that was as a direct result of the Hinckley verdict after the shooting of Ronald Reagan? A. I don't recall the circumstances under which it was formulated. The timing would suggest that.

Q. Well, I mean it's—the Hinckley verdict is treated fairly substantially in here because there was a fairly big public outcry against psychiatrists after he was acquitted on the grounds of insanity; isn't that true? A. I mean, you can characterize the outcry as you wish. I recall that there was quite a vivid public debate.

While Butts claims the Hinckley reference declares the insanity defense was improper and undesirable, the record reflects the prosecution was questioning the expert on a variety of topics, including his compensation, membership to certain associations, and familiarity with the history of the insanity defense, as possible impeachment evidence. We find the reference does not rise to the level of misconduct, and moreover, given the reference was intended to supplement testimony and its limited reference, we find it unlikely any prejudice resulted following this line of questioning.

Next, Butts asserts the prosecution's use of the term "serial rapist" improperly influenced the jury, and his trial counsel was ineffective in failing to move for a mistrial following the judge overruling his objection. The State asserts it asked the question following Butts's testimony in which he claimed the police investigation was excessive. The prosecutor used the term after he "heard [trial counsel] asking a lot of questions about how the police basically, . . . dug into [Butts's] entire life." Butts thought the police investigation was extreme, yet, the prosecutor explained, Butts was "arrested for a pretty serious crime," he did not

have a criminal background, and had extensive military intelligence training. These factors, the prosecutor asserted, provided the police with a basis for their extensive investigation into the crimes and to rule out the possibility that Butts was a "serial rapist" who was associated with other, similar crimes. Because the term supplemented the prosecutor's line of questioning, we find the statement does not rise to the level of misconduct. We also find Butts has failed to establish the statement resulted in prejudice because the statement was isolated to this line of questioning, and the prosecutor used a curative measure to clarify he was not accusing Butts of being a "serial rapist."

Despite trial counsel's objection, Butts asserts his counsel should have moved for a mistrial. As part of the PCR proceeding, trial counsel stated:

> Q. Okay. So my question would be why didn't you move for a mistrial after he injected the idea that there was a serial rapist? A. The judge overruled my objection.
> Q. That's why you wouldn't have moved for— A. End of story, isn't it? I mean, am I missing something?
> Q. Okay. A. The judge says that's a proper question. What makes you think—I say this rhetorically. I don't see any grounds for a mistrial. The judge was on his side.

Trial counsel objected, was overruled, and did not see any reason to make a motion for a mistrial. Because we conclude the prosecution's initial question did not amount to misconduct and Butts was not prejudiced by the question's isolated reference and the curative measures taken, Butts has not shown that he was prejudiced by trial counsel's failure to move for mistrial.

Butts also claims the prosecution made multiple improper references and statements during its closing argument. In this context we note, during closing arguments, counsel is entitled to some latitude when analyzing the evidence

admitted during the trial. *State v. Phillips*, 226 N.W.2d 16, 19 (Iowa 1975). Counsel is allowed to draw conclusions and argue permissible inferences that may be reasonably derived from the evidence. *Id.* However, the prosecutor is not allowed to make inflammatory or prejudicial statements regarding a defendant in a criminal action. *Graves*, 668 N.W.2d at 874.

During closing arguments, Butts contends the prosecutor inferred Butts was lying, told the jury to place themselves in the position of the two sisters, referenced O.J. Simpson, and mentioned the movie *No Country for Old Men*,[3] all of which are instances of misconduct. The prosecution remarked on Butts's defense, stating:

> If you find that the only—if you actually find he slipped into sleepwalking—and I will submit to you that this defense is an incredible one—but if you actually believe he slipped into sleepwalking, you also have to find that it would have happened in the absence of the alcohol.

In determining whether a prosecutor's remarks were proper, *Graves* recommends asking:

> (1) Could one legitimately infer from the evidence that the defendant lied? (2) Where the prosecutor's statements that the defendant lied conveyed to the jury as the prosecutor's personal opinion of the defendant's credibility, or was such argument related to specific evidence that tended to show the defendant had been untruthful? And (3) Was the argument made in a professional manner, or did it unfairly disparage the defendant and tend to cause the jury to decide the case based on emotion rather than upon a dispassionate review of the evidence?

*Id.* at 874–75. Based on the unrefuted testimony of the sisters, as well as Butts's detailed testimony of the events preceding and immediately following the incident, the jury could legitimately infer that Butts was not telling the truth when he claimed

---

[3] *No Country for Old Men* (Paramount Vantage 2007).

to have absolutely no memory of the incident. Further, there is no evidence in the record that the prosecutor conveyed his personal opinion of a witness's credibility. Finally, the prosecutor did not use the words "lie" or "liar" to frame Butts's version of the evening; instead, he used "incredible" when describing the defense. This does not rise to the level of inflammatory language required to be misconduct. *See State v. Carey*, 709 N.W.2d 547, 557–58 (Iowa 2006) (citations omitted) (providing examples of prosecutorial statements that are and are not misconduct).

Butts next claims the prosecutor improperly asked jurors to place themselves in the position of the victim. *State v. Musser*, 721 N.W.2d 734, 754–55 (Iowa 2006) (stating a prosecutor is not "allowed to instruct the jury to place themselves in the position of the victim" (internal quotations and citations omitted)). During closing arguments, the prosecutor argued:

> . . . Can you imagine the terror that those 13 to 14 minutes put into the heart of those girls. So while asleep, [he] points that gun right at her face. She's sitting on the couch terrified, trying to buy time, says she's bantering back and forth.
> . . . .
> . . . Imagine the terror as [the sister] is sitting in that closet—standing there trying to whisper to 911 while this man is trying to sexually assault her sister. And she's just praying that the police get there on time. You hear her, oh, god.
> . . . .
> Can you imagine the bravery that it took for [first sister] as he's heading out into the hallway for him to grab—for her to grab him by the hood, yank that gun out of the holster in the back of his pants and shove him out into the hallway saying I've got the gun; I've got the gun.

We conclude the prosecutor did not ask the jury to place themselves in the victim's position. Instead, the language recounted the testimony given by the sisters, including both the actions taken and the fear they both expressed in their testimony.

Also during closing arguments, the prosecution mentioned the O.J. Simpson trial, stating:

> You heard in this case from the State's witnesses. Obviously we just listened again to some clips from the—from the 911 tape. But you heard from [the first sister] and I want to remind you—I know we've been together almost a week. I mean, we're not O.J. Simpson trialing here where we take a year to try a case. But in a week a lot happens. And I want to remind you kind of what the evidence was in this case. Because as much as the defense would like to have this case be all about Mr. Butts's 20 years of honorable service to the U.S. Army, that's not what this case is about. This case is about 15 minutes in an apartment in Council Bluffs, Iowa.

Considering the *Graves* factors, the reference to the O.J. Simpson trial was isolated to closing statements and had little significance given it referenced the timing and speed of the trial. The prosecutor did not compare Butts or the facts of the case to the O.J. Simpson trial. Thus, the statement does not rise to the level of misconduct.

Finally, the prosecutor referenced the movie *No Country for Old Men* after the defense asked the jury:

> Have you ever in your experience as adults, ever heard of a major crime being committed by somebody in their socks, okay. Now you ask yourself, he goes home, takes off his shoes, his sports coat, his shirt. He's in his socks, pants and white T-shirt and he leaves in that state. Has anybody ever in the name of crime ever gone out in your socks?

The prosecution followed by stating:

> Why was he wearing no shoes. I don't know if any of you ever saw the movie *No Country for Old Men* but there's a hit man in that movie that every time he goes to go into a place to take care of his business he kicks off his shoes and he walks in and he takes care of business. Okay. Why is that? Shoes leave shoe impressions; socks don't. Do I have any evidence that was his reasoning? I just know he was in socks. That's all I can tell you. But if he wants a theory as far as why he would not be wearing shoes, I'll give you a theory. His theory is that it's pretty easy to peel off a pair of socks and get rid of them.

Your shoes leave treadwear. They leave shoe wear impressions. You can tell size of feet. You get blood on where you are—there's a lot of reasons why you might not want to be wearing a pair of shoes when you are going to do something bad in someone's apartment. So if you want a reason, there's a reason.

The reference to the movie was isolated to closing arguments and was in direct response to defense counsel's attempt to weaken the State's case by posing a scenario for the jury to consider—whether they have heard of anyone committing a crime without shoes. Therefore, no misconduct occurred. Because none of the prosecution's statements rose to the level of prosecutorial misconduct and Butts cannot demonstrate any statement resulted in prejudice, we find counsel was not ineffective in failing to object or make a motion for mistrial.

## V. Judicial Conduct

Butts's next claim is that the trial was tainted because the judge was impatient and exerted undue pressure throughout direct and cross-examination of witnesses to meet his self-imposed time restrictions. The State contends Butts has failed to preserve error on this claim because (1) he did not raise it on direct appeal and (2) he raised the issue through an ineffective-assistance-of-counsel claim at PCR but does not continue to assert counsel's ineffectiveness on appeal from the PCR denial; arguing rather, that the court conducted itself improperly, resulting in a denial of his due process right to a fair trial. "It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Lamasters v. State*, 821 N.W.2d 856, 862 (Iowa 2012) (quoting *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002)). Ineffective-assistance-of-counsel claims operate as an exception to the error preservation rules. *State v. Lucas*, 323 N.W.2d 228, 232

(Iowa 1982). We conclude Butts has failed to preserve error on whether the trial court acted improperly because trial counsel failed to object at the time of trial and, despite raising the issue of counsel's ineffectiveness in failing to object to the court's conduct on PCR, he does not continue to advance counsel's ineffectiveness on appeal from the PCR.

Even if we assume that Butts preserved error on the issue, we conclude the trial court did not act improperly. Butts asserts the court acted unfittingly by inappropriately speeding up the proceedings and cutting off questioning that impacted the ultimate verdict. "The presiding judge is not restricted to the functions of a mere umpire or a referee in a contest between opposing parties or counsel. A trial court has the duty to control and conduct its court in an orderly, dignified and proper manner." *State v. Houston*, 439 N.W.2d 173, 177 (Iowa 1989). To that end, a court may act "to require that the proceedings move forward without undue delay." *Id.* (citing *State v. Cuevas*, 288 N.W.2d 525, 531 (Iowa 1980)).

After jury selection, the judge addressed the jury and notified them of the ideal trial schedule for the week. The judge "indicated when we started this this morning, we're—we would really, really like to try to get this done this week but it's really going to be—it's going to be a push to get it done." The judge explained that Mondays are court service days and that, for a variety of reasons, the case would not restart until the following Tuesday, if need be. Despite advising the jury of potential time restrictions, the judge indicated there was a possibility of having arguments and deliberations on the following Tuesday.

Butts asserts the language the judge used during direct and cross-examination shows the judge was pressuring the attorneys on time and, ultimately,

was impatient with the pace of the proceedings. However, a majority of instances Butts cites regarding the judge's comments occurred during the testimonies of Butts's wife and former coworker immediately prior to afternoon recess, and the judge explicitly stated the questioning could continue if need be:

> THE COURT: [to the prosecutor], I didn't intend by our conversation we took last recess to suggest that I'm trying to make you or [defense counsel] finish up with this witness.
> STATE: And I'm almost done here.
> THE COURT: All I'm trying to say is I'm taking a break at noon and at 1 o'clock I'm starting with [the expert] and we're going to stop at noon.
> STATE: I understand and I'm almost done anyway, Your Honor.
> THE COURT: All right.

After trial counsel introduced the concept of lock picking through redirect examination of Butts's wife, the prosecution wished to cross-examine her on that topic, stating:

> DEFENSE COUNSEL: That's all the questions.
> STATE: Well, lock picking is something new so just very briefly on that.
> THE COURT: Again, I don't care. I'm not telling you, you have to be done with her at noon. I'm simply saying we're taking a break at noon.
> STATE: I understand. At noon.

It is evident this line of questioning could have continued after the break. However, once finished with the examination of Butts's wife, his trial counsel quickly called Butts's former coworker to testify before the noon recess. Butts claims both attorneys rushed the examination of this witness; however, as the judge indicated, witness examination did not need to end at noon and could have resumed after the recess and after the expert who could only testify that particular day.

Furthermore, trial counsel believed he presented all of the evidence necessary to provide a proper defense. In response to a deposition question during the PCR action regarding whether counsel wished any additional evidence was presented, trial counsel answered:

> A. No. Nothing. No. Everything that I wanted to present was presented. Every question that I wanted to ask was asked and answered. Any idea about we had to be done or the jury had to finish is incorrect.

Moreover, trial counsel testified that Butts was engaged in the trial by taking notes and Butts did not request that trial counsel ask any additional or follow-up questions after examining any witnesses. Because the judge did not improperly influence the pace of the trial proceedings and because the record shows Butts and his trial counsel presented all of the evidence they wished to present, there is no indication that the judge's conduct was improper or that Butts was prejudiced. Therefore, Butts's trial counsel was not ineffective in failing to object to the judge's conduct during trial.

## VI. Cumulative Error

Finally, Butts contends the cumulative error of his ineffective-assistance claims as asserted above should entitle him to a new trial. "Iowa recognizes the cumulative effect of ineffective-assistance-of-counsel claims when analyzing prejudice under *Strickland.*" *State v. Clay*, 824 N.W.2d 488, 501 (Iowa 2012). If a claimant raises multiple claims of ineffective assistance of counsel, the cumulative prejudice from those individual claims should be properly assessed under the prejudice prong of *Strickland. Id.* If the court only considered the prejudice prong, "the court can only dismiss the postconviction claim if the alleged errors,

cumulatively, do not amount to *Strickland* prejudice."  *Id.* at 501–02.  Here, we do not find the cumulative effect of Butts's attorney's actions or inactions rise to the level of *Strickland* prejudice.

**VII. Conclusion**

As we conclude the district court properly denied Butts's ineffective-assistance-of-counsel claims against both his trial and appellate counsel and because we do not find any structural error in the trial record, cumulative error, or entitlement to kidnapping reconsideration, we affirm the district court's denial of Butts's application for postconviction relief.

**AFFIRMED.**